**In re ANDERSON, CLAYTON
SHAREHOLDERS
LITIGATION.**

**C.A. 8387 Consolidated.**

Court of Chancery of Delaware,
New Castle County.

Submitted: May 27, 1986.
Decided: June 6, 1986.

See also 519 A.2d 694.

A. Gilchrist Sparks, III, Lawrence A. Hamermesh, and Edmond D. Johnson, of Morris, Nichols, Arsht & Tunnell, Wilmington, and Dennis J. Block, and Joseph S. Allerhand, of Weil, Gotshal & Manges, New York, Joseph A. Rosenthal, and Kevin Gross, of Morris & Rosenthal, Wilmington, and Stuart D. Weschsler, Robert I. Harwood, and Zachary A. Starr, of Goodkind, Wechsler, Labaton & Rudoff, New York, for plaintiffs.

Charles F. Richards, Jr., Samuel A. Nolen, Thomas A. Beck, Gregory P. Williams, and Nathan B. Ploener, of Richards, Layton & Finger, Wilmington, and Stephen G. Tipps, and Paula M. Desel, of Baker & Botts, Houston, Tex., for defendant.

ALLEN, Chancellor.

Pending in these consolidated actions brought as class actions by shareholders of Anderson, Clayton & Co. is an application to enjoin preliminarily the consummation of a recapitalization of that firm presently scheduled to be effectuated on June 10, 1986. I assume that the recapitalization proposal was approved by the Anderson, Clayton (the "Company") shareholders at a special meeting held on June 3.

The recapitalization under attack is the most significant part of an effort to restructure Anderson, Clayton, which effort has already entailed the sale for cash of the Company's substantial international operations and certain of its domestic businesses. The recapitalization contemplates the marshalling of additional cash through substantial borrowing and the termination of certain overfunded pension plans. The cash so generated—or most of it—would be distributed to current shareholders pro rata (on a preferred, capital gains basis) as part of the recapitalization. In addition the recapitalization would establish an Employee Stock Ownership Plan ("ESOP") to which would be sold, in effect, a 25% equity interest in the company that emerges from the transaction.

Stated more technically, the recapitalization would involve (1) the sale by the Company from its treasury of 730,202 shares of its common stock for $45 per share to the newly-formed ESOP; (2) the contribution of such shares by the ESOP to a corporation wholly owned by it ("ESOPCO") and (3) a merger of ESOPCO with and into the Company pursuant to which each outstanding share of common stock (other than those held by ESOPCO and shareholders who perfect their appraisal rights under 8 *Del.C.* § 262) will be converted into the right to receive $37 in cash plus .1778 of a share of new common stock of the Company. As part of the recapitalization, the new common stock will be split three shares for one. Thus, as a result of the recapitalization, each shareholder will receive $37 in cash and .5334 (i.e., .1778 x 3) of a share of new common stock for each share of common stock cancelled in the merger.

In essence, the transaction will, if effectuated, provide for an aggregate cash distribution to present shareholders of $456 million and a continuing equity interest by such shareholders in 75% of the resulting, smaller company. The remaining 25% interest in the Company would be held by the ESOP. The resulting corporation will be a smaller, much more highly leveraged entity.

Three identical complaints in these consolidated actions allege (1) that the proposed recapitalization is solely an attempt to make the Company an unappealing takeover target in order to entrench existing management and serves no proper business purpose; (2) that the sale of a 25% interest in the reorganized company contemplated by the recapitalization is for a grossly inadequate consideration and constitutes a fraud on the shareholders; (3) that the directors of the Company did not, before approving the proposed recapitalization, adequately evaluate the Company's worth "as a potential merger or acquisition candidate or take adequate steps to enhance Anderson, Clayton's value or attractiveness as a merger or acquisition candidate; or effectively attempt to dispose of Anderson, Clayton's assets, or act so that the interests of public shareholders were protected"; and (4) in summary, that "the proposal will deny class members their right to fully share proportionately in the true value of Anderson, Clayton ... while usurping the same for the benefit of defendants, at a fraudulently unfair and inadequate price."

In addition, while the complaints contain no specific allegations of inadequate proxy disclosure, a major portion of plaintiffs' argument on the currently pending application for preliminary injunction was premised upon an assertion of that kind.

Defendants defend the merits of the proposed recapitalization as a prudent plan to maximize current as well as longer-term values to all shareholders. They point out that the proposal is one that treats all shareholders equally; that it permits a very significant cash distribution on a favorable tax basis, while leaving all shareholders with a substantial continuing equity interest in the Company's continuing business and that the ESOP, which makes the favorable tax treatment of the cash distribution possible, cannot sensibly be

viewed as an entrenchment device on the facts here presented.

The transaction proposed, defendants have asserted, has been the subject of lengthy consideration and testing by the market. Not only has the First Boston Corporation, the Company's investment banker with respect to this transaction, unsuccessfully sought a buyer for the whole Company, but the present proposal has been publicly announced for some time without engendering any higher or better proposals from third parties. Thus, measured against this background, defendants have said that claims of inadequacy of consideration must be viewed as unsupportable. The effectiveness of this argument has, however, been substantially eroded by developments since the May 27 date of the argument on the pending motion.

Finally, defendants assert that the proxy materials fully meet any obligation the directors have to disclose all germane facts with candor.

### I.

Anderson, Clayton is a diversified company founded originally in 1904 as a cotton merchandising partnership and incorporated under the laws of Delaware in 1929. Over the years, the Company has engaged in a number of different businesses, including the processing and marketing of consumer and institutional foods, pet foods, oilseed products, and animal and poultry feeds, both domestically and internationally. In addition, it has conducted operations in the areas of property and casualty insurance, life insurance, general merchandise warehousing and distribution services, materials handling equipment, and the manufacture of a line of ice chests and beverage coolers. Currently it would best be known to the public through its various branded consumer products such as Gaines dog foods, Chiffon margarine, Seven Seas salad dressings and Igloo ice chests.

In the early part of 1984 senior management of the Company undertook to review this amalgam of tenuously related businesses and to consider steps that might be taken to enhance the Company's profitability. As a result of that review, it was concluded that projected profits from the Company's international operations, from its insurance subsidiaries and from its public warehousing operations were not satisfactory and were unlikely to be significantly improved. Accordingly, senior management decided that those businesses should be sold, permitting the Company to focus on what has been called its core businesses—principally its domestic food and food processing businesses.

This 1984 review of the Company's profitability was part of a strategic evaluation of the firm stimulated in part by knowledge that trusts holding some 27.3% of the Company's outstanding stock were scheduled to terminate in February of 1986. Those trusts had been established some twenty years by the Company's founder, William L. Clayton, for the benefit of his four daughters, who are now of advanced years.

The termination of the Clayton trusts had significant potential effects for the Company's Clayton-family stockholders, for the Company itself, and for other shareholders. Specifically, since the beneficiaries of the Clayton trusts are all of advanced years, the freeing of their Anderson, Clayton stock from the restrictions of the trusts created the prospect of the public sale of such stock—for estate planning or estate tax purposes. The availability for sale of such a significant portion of the outstanding stock raises the obvious possibility, for good or for ill, of an attempted takeover of the Company. That, of course, is not the only possible outcome of the availability of such stock. If there were no firm interested in acquiring Anderson, Clayton and the trust beneficiaries were forced, for estate tax reasons or otherwise, to liquidate their position on the public market, one might expect a downward pressure on the price of the Company's stock which may be detrimental to the Company itself as well as to its

shareholders. In all events, it seems plain that the termination of the Clayton trusts was an event of significance to the Company and all of its shareholders and was the proper subject of management attention.

The beneficiaries of the Clayton trusts were themselves concerned to plan appropriately for action that would be possible upon the termination of the trusts. At the suggestion of Mr. T.J. Barlow, then Chairman of the Board of Anderson, Clayton, the Clayton family members in late 1984 retained the investment banking firm of Morgan Stanley to advise them concerning their Anderson, Clayton holdings. Morgan Stanley prepared a report dated January 30, 1985, on that subject and a report dated February 14, 1985. These studies reviewed the various possible courses of action open to the Clayton stockholders or to the Company—including, among others, a secondary stock offering, a sale of the family's minority interest to a third-party corporation, sale of the entire Company and a liquidation of the Company. In its February 14, 1985, advice to the trustees, Morgan Stanley concluded as follows:

> [W]e recommend that the Trustees recommend to the Company's Board of Directors (the "Board") that the Board explore the sale of the Company both as an entire entity and in separate components pursuant to a plan of liquidation under Section 337 of the Internal Revenue Code; we also recommend that the Trustees recommend to the Company that the Board be prepared to entertain a possible proposal from the Company's management for an Employee Stock Ownership Plan sponsored leveraged buyout of some of the Company's domestic businesses pursuant to a plan of liquidation under Section 337.
>
> We would expect that such a sale of the Company, either as a single entity or in separate components, would realize pre-tax values in the range of $44-$50 per share, with some possibility of values above $50 per share. We cannot opine at this time as to whether the sale of the Company as a whole or in components

pursuant to a Section 337 plan of liquidation will realize the higher value per share either pre-tax or after-tax.

The trustees furnished a copy of Morgan Stanley's February, 1985 conclusion to the Company's board.

Management itself had by that time, however, already begun active exploration of one possible form of restructuring. In January, 1985 senior management of Anderson, Clayton had retained the investment banking firm Kelso & Company to look into the feasibility of a management sponsored leveraged buy-out of the Company through the use of an ESOP. At a May 8, 1985 meeting of the board of directors of the Company, management was formally authorized to proceed with an evaluation of such a transaction.

Also in May, 1985, Anderson, Clayton, acting upon the decision to sell off the least profitable operations and pursue some form of restructuring, retained First Boston Corporation to act as its financial advisor. First Boston came to perform several important tasks including arranging for the sale of substantial assets, exploring restructuring options and fashioning, in important respects, the recapitalization now under consideration.

On September 5, 1985, the Company's management presented to the board for discussion purposes a possible management-sponsored leveraged buy-out transaction. Under this plan, the Company would have adopted a plan of complete liquidation, sold certain of its assets to third parties and sold its remaining businesses to an investment group including members of management, an ESOP and Kelso, the investment banking firm. All other shareholders, including beneficiaries of the Clayton trusts, would have been cashed out, receiving proceeds in a range of $40 to $42 per share. After exploring this transaction further, however, management finally concluded that a going-private transaction of that kind was not feasible.

In October, 1985, the Company's senior management met with the Company's outside directors and recommended that First Boston be directed to solicit indications of interest from parties who might be interested in acquiring the entire company or its non-insurance domestic operations. In that same month, First Boston was directed to solicit indications of interest from parties who might be interested in acquiring some or all of the Company's businesses. In pursuing that directive, First Boston solicited such indications from potential buyers including food companies, firms specializing in leveraged buy-outs and firms specializing in tax-advantaged investments. Although some fourteen potential purchasers were solicited, and detailed information was provided to eleven, no "firm offers" were received and, on December 2, 1985, First Boston so informed the Company's board. It is interesting to note, however, in light of later developments, that First Boston did not apparently approach the Quaker Oats Company—a company that owned a branded pet food subsidiary approximately equal in sales to the Company's Gaines subsidiary.

On November 22, 1985, before the management-sponsored leveraged buy-out transaction was abandoned, First Boston was asked by some members of the board to report to the Company on alternatives. In a December 2, 1985 report, First Boston discussed not only a recapitalization similar to that eventually approved by the board, but also other financial alternatives. First Boston was directed to further explore the feasibility of these alternatives. This seems to have been done throughout January, 1986, with First Boston apparently being in frequent contact with management and various directors during this period.

Meanwhile, First Boston was pursuing sales of divisions or operations that were to be eliminated by the Company. In September, 1985, the Company entered into an agreement, consummated in January, 1986, for the sale of its American Founders Life Insurance Company subsidiary for $58,669,000. In December, 1985 the Company entered into an agreement for the sale of its 75.7% interest in a Brazilian subsidiary and a separate agreement with the same purchaser for the sale of the Company's 60.8% interest in a Mexican subsidiary. These sales were consummated in April, 1986, for an aggregate purchase price of $109,100,000. The sale of the Company's public warehousing and trucking operations was closed in March, 1986 for $22,100,000. In all, the record suggests that the operations that have been sold (not considering revenues generated by insurance operations) apparently accounted for approximately 40% of the Company's 1985 sales and close to 50% of its 1984 sales. (See Proxy Statement, p. 69).

Also during this period the Company decided to terminate two tax-qualified defined benefit retirement plans thereby making available to itself approximately fifty million (after tax) dollars of excess funding held in those plans.

On February 7, 1986, First Boston presented to the board a recapitalization program for its consideration and approval. First Boston indicated at that time its opinion that the transaction being presented was fair from a financial point of view. The presentation took approximately an hour and one-half. At that meeting the board adopted a resolution reciting that the recapitalization was fair to the shareholders and authorized the submission of the transaction to the shareholders for their approval. The board voted unanimously to recommend such approval. The best opinion available to the board at that time and disclosed to shareholders now is that the consideration offered to shareholders in the recapitalization has a current value of between $43 and $47 per share. The Company's stock, which is traded in the New York Stock Exchange, has, over the last six months, traded at prices well over $50 per share.

## II.

On April 22, 1986 the Company distributed to its record shareholders a notice of a

June 3, 1986 special meeting of shareholders called to vote on the recapitalization, together with a proxy statement/prospectus.

On April 30, 1986, plaintiffs orally indicated a desire to move for an order preliminarily enjoining effectuation of the recapitalization. After hurried but fairly wide-ranging discovery was had, that motion was presented to the Court on May 27, 1986. Defendants at that time volunteered not to effectuate the recapitalization until June 10, 1986, even if it were approved by the shareholders—thus providing the Court with a few additional days to consider the arguments advanced. As happens in matters of this kind, however, events did not remain static.

On May 29 the investment banking firm of Bear Stearns & Co., Inc., together with the firm of Gruss & Company, delivered to the Company a letter expressing an interest in making an offer for all shares of the Company's stock at $54 per share cash. This development, which was publicly disclosed on the same day, caused plaintiff to move once more for an order—this time enjoining the holding of the June 3 meeting.

In response to the Bear Stearns offer, the board took several steps: it distributed on June 2 to record shareholders by mailgram (and published that day in the national editions of the New York Times and the Wall Street Journal) a supplemental proxy statement containing the text of the Bear Stearns letter; it established a toll-free phone line for proxy revocation or voting; it extended until 5:00 p.m. June 5 the time in which proxies could be voted; and, it is asserted, that it authorized substantive discussions with Bear Stearns. The board elected not to postpone the June 3 meeting.

Finding no threat of irreparable injury arising from the taking of the vote alone, I declined on June 2 to enjoin the meeting scheduled for the following day. *In Re Anderson, Clayton Shareholders' Litigation*, Del.Ch., 519 A.2d 694 (1986).

On June 4, Bear Stearns filed a complaint in this court, arising from these same facts, seeking to enjoin the recapitalization. That complaint raises several issues principally arising from developments since the May 27 argument on the pending motion. Most significantly, it charges that the Anderson, Clayton board is not attempting in good faith to arrange the most advantageous transaction for the shareholders (which it alleges its $54 per share "offer" to be) and that, indeed, the board is attempting to keep the opportunity that the alternative offers from the shareholders. In all events, the Bear Stearns plaintiffs have themselves moved for a preliminary injunction against effectuation of the recapitalization asserting grounds not treated in this opinion. That motion is now scheduled to be heard on June 9. It will be treated in a separate opinion.

### III.

■ The frequently reiterated test for the issuance of a preliminary injunction requires the Court to assess on the limited record available the probability that plaintiff will ultimately prevail on the claims asserted and the consequences to each of the parties—or to others with legitimate interests in the matter—of the granting or withholding of the provisional remedy. Specifically, the remedy will issue only when plaintiff has established (1) a reasonable probability of ultimate success; (2) that he or she is threatened with irreparable injury before decision on final hearing is likely; and (3) that in granting the remedy the Court will not be doing a greater injury to defendant, the public or others than the injury for which plaintiffs seek to be protected. *See, Revlon, Inc. v. MacAndrews & Forbes Holdings*, Del.Supr., 506 A.2d 173 (1986).

Related to the legal standard for issuance of the remedy sought are the facts concerning the make-up of the board of directors whose actions are here under attack. When judicial review of corporate action is sought, our law draws an impor-

tant distinction between the acts of disinterested directors in managing the business and affairs of the enterprise and acts of directors having a personal interest in the transaction that conflicts with the interests of the corporation and its shareholders.

Plaintiffs contend that a majority of the directors who approved the recapitalization had a personal financial interest in the transaction since eight of the fifteen directors were officers of the Company who would be eligible to participate in, and benefit from, the ESOP. Additionally, three other directors had been affiliated with the Clayton trusts and, according to plaintiffs, had a special interest in seeing the recapitalization approved. Thus plaintiffs contend that defendants will bear the burden ultimately (indeed they seem to contend that defendants bear a burden on this motion) to demonstrate the intrinsic fairness of the recapitalization. Defendants, on the other hand, assert that only five of the fifteen directors had a personal financial interest in the ESOP at the time the recapitalization was approved.[1] First, Mr. Barlow, who plaintiffs apparently count as an officer, had retired as a Company employee effective January 1, 1986 and therefore was and is not eligible to participate in the ESOP. Second, Messrs. Wilson and Underwood, although employees at the time the recapitalization was approved, knew that they would soon be leaving the board and their employment with the Company upon the imminent consummation of the sale of the Company's Brazilian and Mexican operations and therefore would not be ESOP participants.

For purposes of this motion, I regard the directors that were affiliated with the Clayton trusts as disinterested since the financial interest that the beneficiaries of the Clayton trusts have is an interest as shareholders in the Company. *Aronson v. Lewis*, Del.Supr., 473 A.2d 805 (1984). While their personal situation may include

them during a shareholders' vote to vote for the recapitalization, that interest *qua* shareholder does not establish a disabling conflict for such persons *qua* directors in a transaction that will treat all shareholders equally. *Shields v. Shields*, Del.Ch., 498 A.2d 161 (1985). Nor do I think that the three officers who either had resigned as Company employees or knew that their resignation was imminent had or thought they had a personal financial interest in the ESOP at the time the board approved the recapitalization. Therefore, I conclude that the February board was not infected by a conflicting financial interest with respect to the transaction it then recommended to the shareholders.

Equally important for purposes of deciding this motion (except for the disclosure claims) I assume shareholder approval of the recapitalization—since on the alternative assumption the questions presented are moot. On that assumption, it will be plaintiffs' burden to establish either that such approval was ineffective for some reason and the transaction constitutes a breach of fiduciary duty; or that the transaction constitutes a waste or is otherwise invalid. *Gottlieb v. Heyden Chemical Co.*, Del.Supr., 92 A.2d 594 (1952); *Michelson v. Duncan*, Del.Supr., 407 A.2d 211 (1979); *Gerlach v. Gillam*, Del.Ch., 139 A.2d 591 (1958).

For the reasons that follow, I conclude that plaintiffs have not established a reasonable likelihood of success on their claim that the sole or principal purpose of the recapitalization is the entrenchment of encumbent management, that the transaction constitutes a fraud or waste of corporate assets or that the disclosures made were, when considered in their totality, less fulsom or candid than our strict standards require.

### IV.

Argument on the pending motion was directed almost entirely to the adequacy of

---

**1.** Anderson, Clayton's board of directors has changed since the February 7, 1986 vote on the recapitalization. Today the board comprises sixteen members, eight of whom are officers. The relevant board for present purposes is the board that was in existence on February 7.

disclosure, but the substantive fairness and motivation of the defendants was touched upon as well.

The principal non-disclosure argument advanced by plaintiffs is that the recapitalization is the product of an alliance between encumbent management and members of the Clayton family for the purpose of perpetuating control of the Company in themselves, while distributing sufficient cash to the Clayton shareholders to permit them to engage in prudent estate planning. The entire course of conduct over the last year or so—the sale of business segments, the termination of the pension fund in order to re-capture excess funding, the leveraging of the Company contemplated by the recapitalization and most importantly the cash distribution and creation of the ESOP—are all, on this view, illicit attempts simply to make Anderson, Clayton a less appealing, indeed an unpalatable, takeover target.

Creation of the ESOP must be viewed as the critical element in plaintiffs' theory. Without that element of the recapitalization, plaintiffs would have no argument since—assuming fair disclosure—one could hardly argue that approval of a transaction that marshals cash for pro rata distribution to shareholders upon shareholder approval and has no effect on proportionate ownership of the corporation, constituted a breach of the directors' duty of loyalty.

Plaintiffs attack the ESOP on two bases. First, it is assertedly an entrenchment device, solely or principally motivated for an impermissible purpose. Secondly, it is said to constitute a fraud or a waste, in that twenty-five percent of the resulting Company is being conferred upon the ESOP for no consideration or for inadequate consideration. While the stated consideration for the ESOP stock is $45 a share, that consideration will be borrowed by the ESOP from the Company and repaid from future compensation payments made to the ESOP by the Company.[2]

Neither argument, however, on the present record persuades me that plaintiffs have shown a reasonable probability of success on the merits of this aspect of their claim.

■ As to the entrenchment contention, I need not spend too much time on this motion. The test, of course, is whether the board's action is motivated solely or principally for the impermissible purpose of retaining office for personal reasons and not for reasons relating to the corporation's welfare. *See, Bennett v. Propp*, Del.Supr., 187 A.2d 405 (1962); *Cheff v. Mathes*, Del. Supr., 199 A.2d 548 (1964); *Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946 (1985). In these circumstances (*see*, pp. 686–687, *supra*), it is plaintiffs' burden to establish a reasonable likelihood of their demonstrating such a motive. They surely have not done so.

While it seems clear that the recapitalization, if effectuated, will in fact make Anderson, Clayton a less likely and, perhaps, an unlikely takeover candidate, that consequence alone cannot be thought to render corporate action subject to legitimate challenge. All manner of transactions may have such an effect.

Defendants say that the ESOP was motivated by two proper purposes: it was necessary to permit the cash distribution in the recapitalization to be on a capital gains basis and it is an attractive technique (from a tax point of view) to provide a form of compensation to officers and employees. These effects appear to be demonstrably true and I cannot now say that it appears likely that they did not provide the principal motivation in the board's recommend-

2. Consideration of what the ESOP will get for its $45 per share requires a moments consideration to avoid confusion. The ESOP stock will not participate in the $37 per share cash distribution contemplated by the recapitalization. Since thereafter there will be a three-for-one stock split, the ESOP is, in essence, buying, for $45, three shares of the reduced company. On the (informal) First Boston view that each .5334 of a share may be worth between $6 and $10 a share, it would appear that the ESOP would get between $33.72 and $56.20 per share in value (i.e., $3 \div .5334 \times \$6 = \$33.72$) for its $45 consideration.

ing a plan with an ESOP component. Such purposes clearly are proper. *Edelman v. Phillips Petroleum Co.,* Del.Ch., C.A. No. 7899, Walsh, V.C. (February 12, 1985) [Available on WESTLAW, DE–CS database].

Indeed, certain aspects of the ESOP seem inconsistent with the notion that it is merely a device to protect control of the Company. First, the trustee is apparently an independent bank with no significant relationship with the Company. Second, voting of all shares owned by the ESOP will be directed by the trusts' beneficiaries—but only 2.5% of that stock will thus be directed by the five officers-directors who served on the board in February, 1986. Third, in all, those interested officer-directors will, after effectuation of the recapitalization, control the voting of only 1.3% of all outstanding stock. *Compare, Norlin Corp. v. Rooney, Pace, Inc.,* 2d Cir., 744 F.2d 255 (1984).

As to plaintiffs' second basis for attack upon the ESOP—that it constitutes a fraud, a waste or a giveaway—the supporting argument is likely to fail on final hearing, in my view, as it seems predicated upon an erroneous assumption: that the board has an obligation to sell stock to an ESOP only at fair market value. (I leave aside for present purposes any federal tax law requirement that ESOPs may not pay more than fair market value.) Even if the fair value of the stock which the ESOP will buy has a fair value of more than $45 (i.e., the price per share it will, in some sense, pay), that fact would not constitute a wrong to the Company or its shareholders so long as the board reasonably believed that the corporation would receive some consideration in exchange for the conveyance of the treasury shares here involved. *See,* 8 *Del.C.* § 153(c); *Michelson v. Duncan,* Del.Supr., 407 A.2d 211, 222–223 (1979).

■ First, the determination of the appropriate price was made or approved by a vote of a disinterested board and, as plaintiffs have not shown a basis to think that board did not, in making that decision, go through an appropriately attentive process, that judgment is entitled to the presumptive validity accorded to such decisions by the business judgment rule. *See, Aronson v. Lewis,* Del.Supr., 473 A.2d 805 (1984). Even if there is a real (rather than a theoretical) outer limit beyond which such judgments may be substantively reviewed, the fixing of the consideration in this instance involves no such extreme judgment. Thus, the fixing of the consideration is unlikely to be shown to constitute a wrong of any kind to the Company.

Secondly, and equally fundamentally, insofar as the ESOP represents a form of future compensation for the Company's qualifying employees, the stock with which it is funded (together with the expenses of establishing it) really seem to represent a form of pre-paid employment expense. The transfer of the treasury shares to the trustee may have a diluting effect on the remaining equity—just as the payment of any substantial sum may decrease, pro rata, the value of a share. The test as to whether either such transaction is wise or not is whether what the Company expects to secure in return justifies the expenditure. For the reasons outlined above, that, however, is not an inquiry for this Court on these facts.

Accordingly, I conclude for present purposes that the attack upon the ESOP as merely an entrenchment device, as a fraud, or as a waste of assets has not been shown to have a reasonable probability of ultimate success in this action.

### V.

As indicated, the principal arguments pressed by plaintiffs at the argument on the pending motion were devoted to the adequacy of the proxy disclosures. I turn now to a discussion of those issues.

■ It is established by our law that one element of the fiduciary duty that directors of a Delaware corporation owe to shareholders is the duty to provide full and

honest disclosure of material facts relating to any transaction that requires shareholder approval. *Lynch v. Vickers,* Del.Supr., 383 A.2d 278 (1977); *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858 (1985). In deciding that a fact is material and must be disclosed there must be:

A showing of a substantial likelihood that, under all of the circumstances, the omitted fact would have assumed actual significance in the deliberations of a reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information available. *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 944–45 (1985) (quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438 [96 S.Ct. 2126, 48 L.Ed.2d 757] (1976)).

Plaintiffs claim that they have met this standard with respect to at least three separate alleged defects in the April 22, 1986 Proxy Solicitation. First, defendants failed to disclose certain aspects of the Morgan Stanley study which plaintiffs claim are material. Second, defendants did not disclose the results of appraisals of the Company's fixed assets conducted by American Appraisal Associates, Inc. Third, the Houlihan Report, a report prepared by an investment banking firm retained by Republic Bank, the prospective ESOP trustee, was not disclosed in the original proxy materials.[3]

### A.

Plaintiffs contend that the proxy statement omits material information contained in the report prepared by Morgan Stanley in connection with its advice to the Clayton trusts in early 1985. That firm was asked by the Clayton trusts to examine alternatives available to the trusts with respect to their holdings of the Company's stock.

Morgan Stanley's conclusions were stated in a February 14, 1985 letter accompanied by a report setting forth supporting materials. Its conclusion is quoted above at p. 9.

In the proxy statement, Morgan Stanley's role and conclusions were treated as follows:

In late 1984 and early 1985, Morgan Stanley & Co., Incorporated ("Morgan Stanley") prepared certain analyses of the Company for and on behalf of the Clayton Trusts. These analyses were based on a wide variety of assumptions and estimates, and ultimately suggested potential values for a sale of the Company, either as a single entity or in separate components, in the range of $44 to $50 per share, with some possibility of values above $50 per share. The studies prepared by Morgan Stanley for the Clayton Trusts did not relate to a transaction such as the Recapitalization and, to the knowledge of the Company, Morgan Stanley has not prepared any study of the Recapitalization for the Clayton Trusts or anyone else associated with the Company. (See Proxy Statement pp. 34–35).

The contention is that this disclosure is insufficient and misleading since within the text of an earlier version of Morgan Stanley's supporting study (dated January 30, 1985) there is a valuation of the Anderson, Clayton stock between $46 and $60. That range of values was thought possibly achievable under one form of transaction: a liquidation without an ESOP leveraged buyout.

Defendants respond to this contention in three ways. First, the proxy statement recounts verbatim the passage of Morgan Stanley's opinion letter dated February 14, 1985 containing their estimates of value. Second, the January 30, 1985 report in which the higher range appears was mere-

---

3. Plaintiffs have raised additional disclosure arguments but rely principally upon the three points referred to. I have considered the other points raised and have concluded that, in the circumstances presented, none of them appear likely to ultimately be found to constitute a breach of duty to fully and fairly inform shareholders.

ly a draft opinion and the higher range of value was adjusted downward in the final opinion dated February 14, 1985 (to a range of $44–$57 for the same form of transaction). Finally, the values expressed by Morgan Stanley are dated since much has happened to the Company since the opinion was rendered in early 1985.

As to the specific matter alleged as being material, I cannot conclude that it satisfies the legal test of materiality when considered in context. The proxy statement discloses Morgan Stanley's final opinion. Many elements of a firm's value and various alternative means of achieving value are considered by professionals in reaching an opinion as to a range of achievable value. While *facts* concerning the firm or its businesses which support or justify an opinion as to value may themselves be material to a shareholder required to evaluate a proposal, to go beyond disclosure of the opinion itself (where that is appropriate) and require disclosure of intermediate opinions would, in my view, risk far more mischief than it would promise benefit. In the circumstances here presented, I conclude that a reasonable shareholder would not likely find the omitted matter significant in evaluating the proposed recapitalization.

### B.

Plaintiffs also contend that defendants have breached a duty to disclose all germane facts in failing to disclose the results of an appraisal of Anderson, Clayton's fixed assets by American Appraisal Associates, Inc. ("AAA"). In sum, that organization concluded preliminarily that the cost to reproduce the Company's assets was $856,937,000; the fair market value of those assets was $440,251,000 and the orderly liquidation value was $195,581,000.

Defendants respond by asserting that the information complained about is not material for any of several reasons. First, defendants argue that the document was created solely for financing and insurance purposes and represented merely the application of standardized indexing factors to historical costs derived from Anderson, Clayton's records. Consequently, the values derived are not representative of the values actually obtainable by the Company for its assets. Second, the document constituted only a preliminary report. Finally, due to their subjectivity, it is urged that appraisals are inherently unreliable and consequently it would have been misleading to disclose it.

The AAA fixed asset appraisal was to be used in arranging bank financing for the recapitalization. Completed in three weeks, AAA performed a preliminary appraisal of Anderson, Clayton. Using a cost approach, AAA began by reviewing asset records or ledgers provided by Anderson, Clayton which reflected the original cost of the fixed assets. AAA then applied generally available cost indices to account for inflation and depreciation to this internally generated data and adjusted its results after an inspection of approximately 70–80% of Clayton's fixed assets values. (Hallmark Aff. ¶ 5). In conducting its appraisal of the improved and unimproved real estate AAA employed standard real estate appraisal techniques on major sites. However, importantly, AAA made no efforts to review Anderson, Clayton's financial condition nor did it make any determinations with respect to the Company's level of profitability. (Hallmark Aff. ¶ 7).

Upon completion, AAA's report was forwarded to Bank of America who is the lead bank in the lending group involved in the proposed recapitalization. That bank put that report in an information package that was sent to banks interested in financing Anderson, Clayton's recapitalization.

The special nature of appraisals, that is, that they are essentially opinions and therefore inherently of limited utility, has caused the Securities and Exchange Commission and the courts interpreting the federal proxy disclosure rules to regard disclosures of them as creating as many, if not more, risks of misleading investors as benefits. *See, South Coast Services Corp. v. Santa Ana Valley Irrigation Co.*, 9th Cir.,

669 F.2d 1265 (1982); *Gerstle v. Gamble-Skogmo, Inc.*, 2d Cir., 478 F.2d 1281 (1973). Based on these risks, many courts have held that asset appraisals need not be disclosed in proxy materials. However, this is by no means a blanket rule. *See, e.g., Alaska Interstate Co. v. McMillian*, D.Del., 402 F.Supp. 532 (1975); *Denison Mines Ltd. v. Fibreboard Corp.*, D.Del., 388 F.Supp. 812 (1974).

There are some exceptions to the general approach that discourages the disclosure of asset appraisals in proxy materials. First, for example, where one appraisal is disclosed, disclosure of another appraisal done with the same degree of care and with the approval or knowledge of management will be necessary to make that which is disclosed meaningful. *See, Lynch v. Vickers*, Del.Supr., 383 A.2d 278 (1977). Another occasion that would suggest a different approach was treated in a 1980 release by the SEC. That release authorizes disclosure of good faith appraisals of asset valuations made on a reasonable basis in proxy contests in which a principal issue is the liquidation of all or a portion of a target company's assets. SEC Release No. 34–16833, Fed.Sec.L.Rep. (CCH) ¶ 24, 117 (May 23, 1980) (codified at 17 C.F.R. § 241.-16833). *See also, Speed v. Transamerica Corp.*, D.Del., 99 F.Supp. 808 (1951).

■ In determining whether an appraisal of asset values should be disclosed it is not feasible to set forth a single test; that determination must of necessity be made on a case by case basis. In making that determination, one court has suggested consideration of the following factors:

> [T]he facts upon which the information is based; the qualifications of those who prepared or compiled it; the purpose for which the information was originally intended; its relevance to the stockholders'

impending decision; the degree of subjectivity or bias reflected in its preparation; the degree to which the information is unique; and the availability to the investor of other more reliable sources of information. *Flynn v. Bass Brothers Enterprises, Inc.*, 3d Cir., 744 F.2d 978, 988 (1984).

This checklist seems reasonably complete as an intermediate guide in attempting to assess whether a shareholder would likely find the appraisal results of actual significance.[4] Absent special circumstances, the key factor will relate to the form of transaction under consideration. Thus, for example, an appraisal done with a professionally acceptable degree of care would be most likely to be found material where shareholders are asked to authorize liquidation of the firm.

■ In this instance I cannot conclude that the results reported by the AAA asset valuation were sufficiently pertinent to the decision that the shareholders have been asked to make as to likely have been material to a reasonable shareholder. First, the replacement value figure, aside from its reliability, is wholly irrelevant to this transaction. Secondly, as to the fair market value, it is clear that AAA did not engage in a discounted cash flow or other form of financial analysis, so its fair market value figure (to the extent it differs from its orderly liquidation value) is of very little, if any, utility. The fair market value of income producing assets is typically determined by resorting to the financial productivity, so to speak, of such assets. Moreover, the opinion reached on that basis, $440,251,000, even if it were one reached in a final, thorough job, would hardly be regarded as significant where the total mix of available information discloses the cash portion of the recapitalization is $456,000,-

4. The Sixth Circuit has considered and rejected adoption of this test. It has clung to the not unreasonable view that appraisals based upon projections must be disclosed "only if the predictions regarding future ... events are substantially certain to hold." In making this decision the court stated that, "this sort of judicial cost-

benefit analysis [involved in the *Flynn* approach] is uncertain and unpredictable, and it moreover neglects the role of the market in providing shareholders with information regarding the target's value through competing tender offers." *Starkman v. Marathon Oil Co.*, 6th Cir., 772 F.2d 231, 242 (1985).

000. Nor do I consider the orderly liquidation value—which was likely the number that the lending banks reviewed—of $195,581,000 would likely have actual significance to a shareholder asked to vote on the proposed recapitalization of this firm.

Given the particular techniques employed to reach these appraised fixed asset values, the time constraints under which the appraisal was done, the particular transaction subject to shareholder consideration, the attenuated pertinence to such a transaction of liquidation values, and the total mix of information relating to the transaction, I cannot conclude that defendants failed their duty in not disclosing in the April 22 proxy solicitation the AAA results.

### C.

The third piece of information purportedly omitted from the proxy materials was the Houlihan report, a report prepared for RepublicBank, the trustee of the ESOP. Houlihan, Lokey, Howard & Zukin, Inc., "valuation consultants", were retained by RepublicBank to prepare a valuation presentation of Anderson, Clayton to determine whether the consideration to be paid by the ESOP for the Company's securities as a result of the transaction is in excess of the fair market value of the securities to be received by the ESOP and to determine whether the transaction is fair and reasonable from a financial point of view to the ESOP when it is compared to, among other things, the investment of the other stockholders. Houlihan valued the ESOP shares at between $40 million and $50 million. Since the ESOP will pay only $33 million for the shares, Houlihan concluded that the consideration to be paid by the ESOP is less than the fair market value of the securities to be received by the ESOP. Consequently, the transaction is fair and reasonable from a financial point of view to the ESOP when it is compared to the investment of the other shareholders.

In arguing against its disclosure defendants assert that they had no knowledge of the range of value attributed to the ESOP's shares by Houlihan at the time the proxy statement was disseminated. Instead, this information was only obtained by the defendants during discovery for this litigation.

It is true that under federal law proxy solicitors have a continuing obligation to disclose material facts to shareholders even after a proxy statement has been disseminated. *Aegis Corp. v. Goldman,* S.D.N.Y., 523 F.Supp. 1273 (1981); *Ronson Corp. v. Liquifin Aktiengesellschaft,* D.N.J., 370 F.Supp. 597 (1974). However, this Court has held that any such obligation under state law does not necessarily extend to opinions not authorized or obtained by defendants and upon which the defendants did not rely in formulating their judgment to recommend that recapitalization plan. Such a requirement would impose an unreasonable burden upon defendants in distinguishing material facts from unsupported opinions. *Edelman v. Phillips Petroleum Co.,* Del.Ch. C.A. No. 7899, Walsh, V.C. (February 12, 1985) [Available on WESTLAW, DE–CS database]. Obviously, defendants may not be faulted for not disclosing an opinion of which they were unaware, even if one assumes its materiality—which on the facts I am inclined to doubt. As indicated below, some disclosure of this matter was made in the June 2 supplemental proxy solicitation. Accordingly, it currently appears unlikely that the Houlihan report may be a predicate for a finding of liability on the part of defendants for a breach of their duty of candor.

### D.

As indicated above, the June 2, 1986 proxy supplement occasioned at the last moment by the Bear Stearns proposal to the board, contained supplemental disclosures as well as the text of the Bear Stearns May 29, 1986 letter to the Company.

In part such supplemental disclosure provided as follows:

At [the hearing on the pending motion] plaintiffs contended, among other things,

that the Company should have disclosed in its Proxy Statement/Prospectus (i) that a draft report dated January 30, 1985, prepared by Morgan, Stanley & Co., Incorporated ("Morgan Stanley") for and on behalf of the Clayton Trusts (the "Morgan Stanley Report") contained analyses suggesting potential values for a sale of the Company, either as a single entity or in separate components, of $46 to $60 per share; (ii) that a report dated November 23, 1985, prepared for the Company by American Appraisal Associates, Inc. (the "American Appraisal Report"), showed estimated values of certain of the assets of the Company on "Cost of Reproduction New", "Fair Market Value" and "Orderly Liquidation Value" bases of $856,937,000, $440,251,000 and $195,581,000, respectively; and (iii) that a "Valuation Presentation" dated March 13, 1986, prepared by Houlihan, Lokey, Howard & Zukin, Inc. for and on behalf of RepublicBank Dallas, N.A., the ESOP trustee (the "Houlihan Report"), suggested a range of values for the shares to be issued to the ESOP as part of the Recapitalization of $54 to $68.50 per share.

This disclosure was followed by a statement of defendants' contentions as to why the foregoing does not reflect a material fact required to be disclosed.

While I have determined for the above-stated reasons that I believe defendants to be essentially correct in arguments concerning the substance of the Company's disclosures treated in this opinion [5], that determination has been made somewhat easier by the circumstance of this later disclosure on these points. In so indicating, however, I address only the quality of those disclosures and not the adequacy of the circumstances (i.e., timing) in which they were made. That issue—i.e., "whether, despite what appears to be diligent efforts of defendants, this material information [there referring to the Bear Stearns

"offer"] has been disseminated in a way that in fact provides record shareholders with a reasonable opportunity to vote on the important recapitalization proposal on an informed basis", *In re Anderson, Clayton Shareholders' Litigation*, at p. 699 is one that I expect to be raised on the motion of Bear Stearns scheduled to be heard on June 9 seeking to enjoin the recapitalization.

## VI.

 For the foregoing reasons, the application for a preliminary injunction shall be denied.

IT IS SO ORDERED.

---

**5.** This opinion does not treat, and I reserve for later decision, claims relating to the alleged inadequacy of the proxy solicitation's treatment of the appraisal remedy option.