Frank A. KLAUS, Plaintiff-Appellant,

v.

HI–SHEAR CORPORATION et al.,
Defendants-Appellees.

Frank A. KLAUS, Plaintiff-Appellee,

v.

HI–SHEAR CORPORATION, a Califor-
nia Corporation, and Hi-Shear Caribe,
a California Corporation, Defendants-
Appellants.

Frank A. KLAUS, Plaintiff-Appellee,

v.

George S. WING and Perry A. Luth,
Defendants-Appellants.

Nos. 75–1544, 75–1920, 75–1389, 75–1394,
75–2380, 75–2446 and 75–2012.

United States Court of Appeals,
Ninth Circuit.

Dec. 15, 1975.

Ernest Leff (argued), of Hahn, Cazier, Hoegh & Leff, Peter Taft (argued), of Munger, Tolles, Hills & Rickershauser, Ira Rivin (argued) of Epport & Delevie, Alan Stamm (argued), of Long & Levit, James W. McCord (argued), of Bodkin, Breslin & Luddy, Los Angeles, Cal., Jeffrey D. Jennings (argued), of Scales, Patton, Ellsworth & Corbett, San Diego, Cal., for appellants in Nos. 75–1389, 75–1394, 75–2446, 75–2012, 75–2380 and for appellees in Nos. 75–1544, 75–1920.

Samuel O. Pruitt (argued), of Gibson, Dunn & Crutcher, Los Angeles, Cal., for appellee in Nos. 75–2380, 75–2012, 75–2446, 75–1389, 75–1394, and for appellant in Nos. 75–1920, 75–1544.

## OPINION

Before CHOY and GOODWIN, Circuit Judges, and TAYLOR,* District Judge.

* Honorable Fred M. Taylor, United States District Judge, District of Idaho, sitting by designation.

CHOY, Circuit Judge:

Since early 1973, Frank A. Klaus has been attempting to wrest control of Hi-Shear Corporation away from George S. Wing and his allies, Hi-Shear's present management. Klaus is conducting litigation in district court in which he charges that the Wing group, in its effort to retain control of Hi-Shear, has violated federal and state securities laws and regulations. In a running endeavor to stabilize the battle for control, pending its decision on the merits, the district court issued over a period of months a number of preliminary injunctions against the voting of certain shares of stock. It refused to issue other injunctions requested by Klaus. One side or the other appeals from each order entered by the district court.

All the preliminary injunctions were improperly issued because they were based on a mistaken theory of the law. The plaintiff could not establish a likelihood of success under the Exchange Act claims, so no injunctions should issue on that basis. The ESOT injunction was improper in the circumstances here because plaintiff could not establish irreparable harm. The Caribe injunction and the Midwood order were improper for failure to join an indispensable party, and the injunction on the exercise of stock options was improper as untimely.

We affirm in part, reverse in part and remand.

### History of the Litigation

Hi-Shear is a successful California corporation, founded in 1943 by Wing. Wing serves as president and chairman of the board. Klaus first tried to acquire control of Hi-Shear in April 1973 by making a cash tender offer for all outstanding stock. Hi-Shear's management countered by purchasing over 660,000 shares from its shareholders pursuant to its own tender offer. Rather than retain them all as non-voting treasury shares, Hi-Shear resold $130,000 of the shares at cost to its wholly-owned subsidiary Hi-Shear Caribe (Caribe). Hi-Shear reported to its shareholders and to the Securities and Exchange Commission (SEC) that it had purchased all of the 600,000 some shares. The district court found that Hi-Shear intended to convey the impression that only Hi-Shear had purchased the shares.

Klaus made a second tender offer on August 8, 1974, for a certain number of shares which he thought necessary for majority control. When his second offer closed on October 4, 1974, Klaus held 555,514 of Hi-Shear's 1,231,816 outstanding votable shares—about 45 percent. If the 130,000 shares held by Caribe had been non-votable treasury stock, as Klaus then believed, Klaus would have held over 50 percent of the total shares on October 4. At this point, Klaus demanded a special meeting of stockholders for an election of new directors. See Cal.Corp. Code § 2202. The meeting was scheduled for December 20, 1974.

During October 1974, Hi-Shear's management approved three stock issuances which resulted in Klaus' controlling a much smaller percentage of the total stock. On October 11, management issued 50,000 shares in exchange for all the stock of Southern California Signal Industries, Inc. (Signal), a machine shop. Under the acquisition agreement, Hi-Shear's management was granted an irrevocable proxy to vote the shares transferred to Signal's former owner.

On October 15, management approved formation of an Employee Stock Ownership Trust (ESOT). Hi-Shear donated to ESOT 30,000 treasury shares and guaranteed a bank loan with which ESOT purchased another 50,000 shares from Hi-Shear at market value.

Finally, on October 31, Hi-Shear acquired another shop, Western Methods Corporation (Western). Hi-Shear paid for Western by issuing 100,000 shares to Western's owner. The sale agreement allowed the seller to rescind the sale if Klaus later should obtain control of Hi-Shear, so long as the seller himself did not vote his 100,000 shares for Klaus.

On October 18, Klaus responded to these maneuvers with a suit in district court alleging violations of sections 10(b)

and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78n(e). Amendments to his complaint also alleged violations of section 14(a) of the Act, 15 U.S.C. § 78n(a), and of management's fiduciary duties under state law. He requested rescission of the stock transfers to Signal, and injunctions against the voting of those shares transferred and against any future transfers pursuant to the Signal agreement. On November 7, he amended his complaint to request similar relief as to ESOT and Western transfers.

During November, Klaus apparently learned for the first time that the Caribe shares were outstanding shares, which management intended to vote. On December 13, he again amended his complaint, asserting that the Caribe shares could not be voted under California law and asking that their voting be enjoined. On December 19, the eve of the special election, the court issued a temporary restraining order against the voting of the Caribe shares. The next day, Klaus nevertheless lost his bid for control, as the newly-issued Signal, ESOT, and Western shares were voted for management.

The court scheduled hearings for December 10–13, 1974, on Klaus' motions for preliminary injunctions. In subsequent weeks, the court issued a number of orders granting or refusing preliminary injunctions pending a decision on the merits of Klaus' amended complaint.

### District Court Orders

January 13—Order granting "Caribe Injunction"—The court noted its intention to grant a preliminary injunction barring the voting of Caribe's 130,000 shares. At this time, Caribe was not a named party in the action. On January 28, and 29, Caribe sold 128,000 of its Hi-Shear shares to Midwood Industries. Klaus added Caribe as a defendant in his third amended complaint on February 4.

January 14—"Rule 62c Injunction"—The court ordered Hi-Shear to hold its regular annual meeting of stockholders, which had not been held in 1974, no later than February 28, 1975. It also ordered Hi-Shear to issue no new stock before the annual meeting. The court stated that the injunction was issued pursuant to Fed.R.Civ.P. 62(c) (Injunction Pending Appeal), apparently in anticipation of appeals from orders which were not formally announced until February 5.

February 5—Order denying Klaus' motions for preliminary injunctions against the voting of the shares issued to Signal and Western Methods.

February 5—"ESOT Injunction"—The court issued a preliminary injunction barring the voting or counting of shares held by ESOT.

February 5—"Caribe Injunction"—The court issued a preliminary injunction against the voting of the Hi-Shear stock held by Caribe.

February 12—"Midwood Order"—The court extended the Caribe Injunction to forbid the voting of the 128,000 shares which Caribe had transferred to Midwood, and barred their being voted by any future transferee.

February 13—Order denying Hi-Shear's motion to modify the ESOT trust agreement to permit ESOT's Hi-Shear stock to be voted by its employee beneficiaries rather than by the ESOT committee which was under the influence of Hi-Shear's management.

After the December hearings which resulted in these orders, Hi-Shear's management encouraged its employees to exercise stock options which had previously been issued to them. Under an option plan adopted in 1972, holders could exercise their options by executing a note to Hi-Shear in payment for the purchased shares. Management now provided its employees forms for long-term promissory notes and offered them rescission agreements binding Hi-Shear to repurchase the stock if Klaus should gain control. By January 14, when the Rule 62(c) Injunction banned further stock issuances, Hi-Shear employees had exercised options for 71,000 shares, 27,000 of them by Vice President Perry A. Luth, but the certificates were not delivered

until January 22. The court held that issuance of the certificates violated the Rule 62(c) Injunction, and another series of orders was forthcoming:

February 26—"Temporary Restraining Order" and "Preliminary Injunction in Aid of Jurisdiction of Court (28 U.S.C. § 1651(a) [All Writs Act])"—The court enjoined Luth from voting his 27,000 shares and enjoined President Wing from voting a number of his own shares equal to those issued under the 1972 stock option plan to non-party employees not within the court's jurisdiction.

The court-ordered 1974 annual meeting was held on February 28, 1975. Management defeated Klaus 615,453 to 593,687. Injunctions prevented another 281,000 shares from being cast for management.

April 1—"Stock Option Injunction"— The court issued a preliminary injunction, after a March 14 hearing, restating the February 26 orders.

April 2—"Second Rule 62c Injunction" —The court extended the terms of the first Rule 62(c) Injunction past its original February 28 expiration date. The court also enjoined Hi-Shear and its subsidiaries from changing their articles of incorporation to affect the rights of stockholders, and, *inter alia*, from merging, entering into certain employment contracts, and disposing of capital assets outside the ordinary course of business.

### Findings and Conclusions

The court's orders granting or denying injunctions were the result of the following findings of fact and conclusions of law:

The agreement establishing ESOT provided that the Hi-Shear shares held in trust would be voted as directed by the ESOT committee. The court held that this provision constituted a proxy solicited by management. Because no proxy statement had been filed with the SEC, management was found in violation of section 14(a) and rule 14a, 17 C.F.R. § 240.14a. The court also found that management's public statements that

Klaus' second tender offer, if successful, would result in Klaus' obtaining majority control were false and misleading. The court believed that at the time the statements were issued, management intended to dilute the voting power of Klaus' shares by issuing the ESOT (as well as the Signal and Western) shares and thus prevent Klaus from obtaining control. The court held that management thus violated section 14(e) of the Act. The court also held that management's conduct in establishing and transferring shares to ESOT was in violation of California law.

In denying Klaus' motions for injunctions against the voting of the Signal and Western shares, the court held that Klaus had not sufficiently demonstrated violations of sections 14(a) or 14(e). It found that management's "control purpose" in completing the Signal and Western transactions (*i. e.*, preventing Klaus' control by diluting the voting strength of his stock) was a substantial purpose, but that its principal purpose was to attain legitimate business objectives. Therefore, the court found no violation of California law.

The court held that issuance of the stock option shares constituted a wrongful use, presumably under California law, by Hi-Shear's directors of their corporation position in order to further their personal interests. The court also found that the shares were issued in violation of its first Rule 62(c) Injunction.

The court held that management had intentionally misrepresented to its shareholders that it alone had acquired all of the shares purchased as a result of its 1973 tender offer. Such shares would be non-voting treasury shares under California law. The court found that Klaus could not reasonably have known that any of those shares could be voted for management, and that he relied on management's statements in determining the size of his second tender offer. Therefore, the court held that management was estopped from voting any of the 130,000 shares transferred by Hi-Shear to Caribe.

### Jurisdiction

■ Klaus' amended complaint alleged that the agreements by which Hi-Shear retained voting rights in the stock issued to ESOT and to Signal constituted a solicitation of a proxy in violation of section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a). He claimed that Hi-Shear had stated publicly that Klaus' second tender offer, if successful, would result in his obtaining control of Hi-Shear's management, but that management knew that issuance of new stock to ESOT, Signal, and Western would so dilute the voting strength of his shares as to prevent his obtaining control even if his tender offer was completely successful. Those public statements thus were asserted to be false and misleading within the intent of section 14(e) of the Act, 15 U.S.C. § 78n(e). Klaus alleged finally that these same transactions constituted a breach of management's fiduciary duty to its stockholders, in violation of California corporation law as well as of the evolving fiduciary standards imposed by sections 10(b) and 14(e) of the Act, 15 U.S.C. §§ 78j(b), 78n(e), and by rule 10b–5, 17 C.F.R. § 240.10b–5.

The court had jurisdiction over the federal claims under 28 U.S.C. § 1331. The state and federal claims "derive from a common nucleus of operative fact." *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). The court therefore also had pendent jurisdiction over the state claims. The federal issues presented were substantial and not frivolous; the district court will retain power to adjudicate the state claims even if it should ultimately dismiss all the federal claims. *Id.* We have jurisdiction on appeal under 28 U.S.C. § 1292(a)(1).

### Review of Preliminary Injunctions

■ Whether a preliminary injunction should be granted or denied lies within the sound discretion of the district court. We will ordinarily reverse an order granting or denying a preliminary injunction only for an abuse of that discretion. *Robinswood Community Club v. Volpe,* 506 F.2d 1366, 1368 (9th Cir. 1974); *County of Santa Barbara v. Hickel,* 426 F.2d 164, 168 (9th Cir. 1970). The conclusions of law upon which the district court bases such an order are subject to review, however, and we will vacate an injunction based on an erroneous legal premise. *Douglas v. Beneficial Finance Co.,* 469 F.2d 453, 454 (9th Cir. 1972).

### Irreparable Harm

In issuing each of its injunctions, the court concluded that money damages would not afford Klaus adequate relief for the harm caused him by management's violation of the law. It found that a balancing of the equities in each instance indicated that management should not be permitted to vote the shares in question pending a final judgment. We find that the court applied an improper test for the availability of injunctive relief.

The Supreme Court has recently restricted the availability of injunctive relief to either of the parties contesting a takeover bid for an alleged violation of the federal securities laws. *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975). The Seventh Circuit had enjoined voting of shares purchased without the filing of the proper forms with the SEC in violation of section 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d). The court had held that the plaintiff corporation was harmed by Rondeau's failure to disclose information about himself and his purpose in purchasing the corporation's stock, because the corporation's management was delayed in its efforts to respond to a possible takeover threat. The Supreme Court reversed, holding that a showing of irreparable harm remained essential for injunctive relief; furthermore, the harm must be threatened not to the immediate contestant in the takeover bid, but to those parties whom Congress intended the Act to protect—the investors to

whom the tender offer was made. The Court found that any possible harm which Rondeau's violation of section 13(d) caused the investing public was either too remote to warrant injunctive relief or could be adequately redressed by money damages.

### Illegal Proxies

■ In enacting section 14(a), Congress intended to guarantee the integrity of the processes of corporate democracy. Section 14(a) is intended to insure that a shareholder entitled to vote on corporate decisions knows how his vote will be cast before he grants his proxy to management or others. The harm to be averted is only indirectly that to the individual shareholder. *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 1593 (1970); *J. I. Case Co. v. Borak*, 377 U.S. 426, 432, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). Although a demonstration that proxies were obtained by materially misleading solicitation establishes a violation of section 14(a), the relief available to a plaintiff who did not himself grant a proxy depends on equitable considerations based on "the best interests of the shareholders as a whole." *Mills*, 396 U.S. at 388, 90 S.Ct. at 623.

■ Klaus did not himself grant a proxy. He is able to assert a section 14(a) violation only derivatively on behalf of Hi-Shear. "[N]othing in the statutory policy 'requires the court to unscramble a corporate transaction merely because a violation occurred.'" *Mills*, 396 U.S. at 386, 90 S.Ct. at 622. Klaus has not demonstrated equitable reasons that would justify rescinding, in effect, the proxies which may or may not have been illegally solicited. The equities weigh especially strongly against Klaus where it is clear that the proxies were freely given with full awareness of the issues involved.

### Misrepresentation

■ Section 14(e), like the section 13(d) at issue in *Rondeau*, was one of the 1968 Williams Act amendments to the Securities Exchange Act of 1934. In enacting the Williams Act, Congress reacted to the trend toward making takeover bids by cash tender offers rather than by solicitations of proxies. As the Court stated in *Rondeau*:

> The purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party. . . . [T]he Act's draftsmen commented upon the "extreme care" which was taken "to avoid tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid."

422 U.S. at 58–59, 95 S.Ct. at 2075–76.

■ Although, as the district court found, Klaus was misled to his detriment by Hi-Shear's misrepresentations, and so made a cash tender offer for fewer shares than he in fact needed for majority control, the Court decided in *Rondeau* that the Williams Act was designed to protect cash tender offerees, not offerors. The district court issued its ESOT injunction entirely on the basis of harm to Klaus. We see no possibility that Hi-Shear's misrepresentation resulted in any harm to the cash tender offerees, certainly none that could not be compensated by money damages. *See Rondeau*, 422 U.S. at 59–60, 95 S.Ct. at 2076–77.

■ Klaus has not demonstrated the irreparable harm from violations of sections 14(a) and 14(e) necessary to entitle him, under the relevant Supreme Court decisions, to permanent injunctions against the voting of the ESOT, Signal, and Western shares. Because he has no possibility of success on these theories, a preliminary injunction may not be based on them. A likelihood of success exists, however, based on his theory that Hi-Shear has violated its fiduciary duties under California law.

### Fiduciary Duties

■ At the outset, we decline on this appeal to consider Klaus' argument that

federal fiduciary standards may be inferred from sections 14(e) and 10(b) and rule 10b–5. Whatever the merits of his argument,[1] it was not presented to the district court. The court thus did not abuse its discretion in ignoring this ground for relief in refusing a preliminary injunction against voting of the Signal and Western shares. Moreover, the asserted federal fiduciary standards would more or less duplicate those which have more surely evolved in California law, and so Klaus is not prejudiced by our refusal to consider his argument on appeal.

We hold that the court's finding that the principal purpose of the issuance of stock to ESOT was to dilute Klaus' voting strength is not clearly erroneous. Viewing the record as a whole, management's conduct in issuing so much stock on so many pretexts in so short a period of time provides a reasonable basis for the court's finding, even in the face of evidence that management had been contemplating such an employee stock plan for over a year. Also, conflicting evidence was presented as to management's conduct in acquiring Signal and Western. The evidence supporting management demonstrated a continuing policy of acquiring such properties and indicated a certain amount of care in negotiating for them. The court's finding that Signal and Western were acquired principally for legitimate business purposes was not clearly erroneous.

The general rule in California is that, in the absence of fraud or breach of trust, a court will not entertain a challenge by minority stockholders of a "business judgment" by the corporation's directors. ~~Fairchild v. Bank of America~~, 192 Cal.App.2d 252, 256, 13 Cal.Rptr. 491, 493 (D.C.A.1961). Klaus in effect, however, alleges a breach of trust. The California court has held that majority stockholders have a fiduciary responsibility to the interests of *both* the corporation and the minority stockholders.

*Jones v. H. F. Ahmanson & Co.*, 1 Cal.3d 93, 81 Cal.Rptr. 592, 460 P.2d 464, 471 (1969):

Majority shareholders may not use their power to control corporate activities to benefit themselves alone or in a manner detrimental to the minority. Any use to which they put the corporation or their power to control the corporation must benefit all shareholders proportionately and must not conflict with the proper conduct of the corporation's business.

In *Ahmanson*, the majority stockholders set up a holding company in a manner which made the minority shares unmarketable. *Ahmanson* thus defined the duties of majority shareholders as private individuals, not as directors of the corporation. In so doing, it acknowledged that controlling shareholders acting as individuals have the same fiduciary responsibilities as they do when acting as directors. Conversely, the language in *Ahmanson* applies equally to the board of directors through which the majority shareholders operate.

It is true that the majority in *Ahmanson* was openly seeking its own advantage, while Hi-Shear's management asserts that the voting advantage which accrued to it was only incidental to the advantage which accrued to the corporation from the establishment of ESOT. Hi-Shear thus argues that management's actions are insulated from scrutiny by the "business judgment" rule. But language in *Ahmanson* requires management to demonstrate more than that the corporation derived some advantage from its actions. The majority shareholders in *Ahmanson* exercised control over the corporation for their own advantage:

without regard to the resulting detriment to the minority stockholders and in the absence of any compelling business purpose. . . . At the trial they may present evidence tending to show such good faith or compelling

---

1. *See generally* Note, *The Controlling Influence Standard in Rule 10b–5 Corporate Mis-* *management Cases*, 86 Harv.L.Rev. 1007 (1973).

234

business purpose that would render their action fair under the circumstances. 460 P.2d at 476. "Compelling business purpose" suggests a balancing of the good to the corporation against the disproportionate advantage to the majority shareholders and incumbent management.

The district court found that Hi-Shear's principal motive was self-serving rather than a business judgment, and thus lacking in good faith. Hi-Shear did not suggest any compelling reason why ESOT had to be established at a time so advantageous to those in control rather than a few months later when it would not have caused a severe injury to Klaus, the principal minority shareholder. The court reasonably found that in these circumstances the purported business purpose of the issuance of shares to ESOT was not sufficiently compelling to outweigh the unfair advantage to management at Klaus' expense ("the control purpose"). On the other hand, the court found a sufficiently compelling business justification to render the purchase of Signal and Western Methods and the accompanying issue of Hi-Shear shares fair to the minority shareholders as well as to the corporation.

▇▇▇ Unlike federal securities statutes, California fiduciary standards do not protect the corporation's right to informed proxy voting by its stockholders, or the shareholder's right to accept or reject tender offers intelligently. Rather, they protect the substantive rights of minority shareholders such as Klaus. The district court may well ultimately determine that Klaus is entitled to a permanent injunction against the voting of the ESOT shares as the appropriate remedy for management's violation of its fiduciary duties toward Klaus. We would affirm a preliminary injunction against the transfer of those shares, if they had not already been transferred, because of Klaus' likelihood of success on the merits and the irreparable harm which would result if he were forced to "unscramble the egg" after the transaction was concluded.

▇▇▇ Unfortunately, however, the egg has already been scrambled, and a delay in any possible disenfranchisement of the ESOT shares will not cause Klaus any irreparable harm. Putting Klaus in a position where he could oust management while the litigation is still pending would only further complicate this complex case. A preferable course is to stabilize all parties' positions as far as possible, preventing either management or Klaus from obtaining a new advantage over the other until the court can resolve all the legal issues. This is not the proper stage of the litigation to attempt to right past wrongs by enjoining the voting of stock already transferred. Therefore, we reverse the order of the district court and vacate the ESOT Injunction.

### Caribe Injunction

Caribe was first named a defendant in Klaus' second amended complaint on December 20, 1974. Caribe did not receive notice of the January 13, 1975 hearing which led to the February 5 Caribe Injunction, however, and was not represented at the hearing. Midwood never was named as a defendant, and was not notified of or present at the February 12 hearing.

▇▇▇ Fed.R.Civ.P. 19(a) requires that a person subject to process whose joinder will not deprive the court of jurisdiction must be joined as a party if he claims an interest in the subject of the action and if his absence might as a practical matter impair or impede his ability to protect that interest. By this standard, Caribe clearly was an indispensable party to the February 5 injunction, as was Midwood to the February 12 order. Under California law, the right to vote a share of stock is a property right. *Meyberg v. Superior Court*, 19 Cal.2d 336, 341, 121 P.2d 685 (1942). The order enjoining Hi-Shear from counting the votes of the Caribe stock deprived its owner of that property right. Caribe is

a California corporation. Midwood is a New York corporation presumably subject to process under California's long-arm statute. The joinder of both corporations therefore was feasible under rule 19(a). "When necessary, . . . a court of appeals should, on its own initiative, take steps to protect the absent party, who of course had no opportunity to plead and prove his interest below." *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 111, 88 S.Ct. 733, 738, 19 L.Ed.2d 936 (1968). The Caribe Injunction and the Midwood Order are vacated because of the district court's failure to join indispensable parties; also because of Klaus' failure to give notice to Caribe and Midwood as required by Fed.R.Civ.P. 65(a)(1). "The notice required by Rule 65(a) before a preliminary injunction can issue implies a hearing in which the defendant is given a fair opportunity to oppose the application and to prepare for such opposition." *Granny Goose Foods, Inc. v. Teamsters Local No. 70*, 415 U.S. 423, 434 n. 7, 94 S.Ct. 1113, 1121, 39 L.Ed.2d 435 (1974). Neither party was represented at the December hearings.

### Stock Option Injunction

 The district court found that Hi-Shear had issued stock pursuant to its 1972 stock option plan in violation of the (first) Rule 62(c) Injunction. We disagree. The court on January 14, 1975, ordered:

> Pending such annual meeting and consequent election of a new board of directors, the defendant shall not cause to be issued any shares of its stock without prior order of this court or of the Court of Appeals.

The stock issue which the court claims was in violation of this injunction was transferred to Hi-Shear employees upon exercise of their stock options and execution of promissory notes to Hi-Shear, prior to January 14. Only the formal issuance of the stock certificates occurred after that date. In California, a stock certificate is evidence of ownership, but its possession is not an essential ingredi-

ent of ownership. *Mindenberg v. Carmel Film Productions, Inc.*, 132 Cal. App.2d 598, 282 P.2d 1024, 1031 (1955); *Mitchell v. Beckman*, 64 Cal. 117, 28 P. 110, 111 (1883). The employees became owners before January 14. They were entitled to demand issuance of the certificates evidencing that ownership, and Hi-Shear did not violate the injunction by issuing them.

The court also based its injunction on the alternative ground that the issuance of 71,000 shares under the 1972 option plan constituted a wrongful use of corporate positions by members of management to further their own ends. Wing and Luth challenge the injunction, claiming a number of procedural errors which deprived them of due process rights. We do not reach these objections. The preliminary injunction, if based on findings of violations of California fiduciary standards cannot be justified by any anticipated irreparable harm to Klaus. Our conclusion is based on the same analysis as presented in our discussion of the ESOT Injunction.

The order enjoining the voting of 71,000 shares of stock held by Wing and Luth is reversed.

### Rule 62 Injunctions

 Hi-Shear's appeals from the two rule 62(c) injunctions are dismissed as moot. The purpose of an injunction issued pursuant to Fed.R.Civ.P. 62(c) is preservation of the status quo until the court of appeals has acted on an appeal from an order granting or denying an injunction. The rule 62(c) injunctions thus have terminated automatically with our disposition of the other appeals. Objections to the validity of a rule 62(c) order could be made only by motion, pending action on the principal appeals.

### Conclusion

For the reasons stated, the appeals from the two rule 62(c) injunctions are dismissed as moot. All other orders granting injunctions are vacated, and all orders denying injunctions are affirmed.

The case is remanded to the district court for further proceedings and disposition on the merits. The court is of course free to enter any interlocutory orders it deems desirable, compatible with the guidelines set forth herein.

Affirmed in part, Vacated in part, and Remanded; Each party to bear his costs.