**ROYAL BUSINESS GROUP, INC., et al., Plaintiffs, Appellants,**

v.

**REALIST, INC., et al., Defendants, Appellees.**

**No. 90–2228.**

United States Court of Appeals, First Circuit.

Heard April 3, 1991.

Decided May 22, 1991.

---

Edward P. Leibensperger, with whom Virginia A. Bonesteel, Julie A. Trachten, and Nutter, McClennen & Fish, Boston, Mass., were on brief, for plaintiffs, appellants.

Maureen A. McGinnity, with whom Michael Fischer, Foley & Lardner, Milwaukee, Wis., David L. Kelston, and Friedman & Atherton, Boston, Mass., were on brief, for defendants, appellees.

Before CAMPBELL and SELYA, Circuit Judges, and BOWNES, Senior Circuit Judge.

SELYA, Circuit Judge.

This case requires us to consider whether a proxy contestant has standing to sue under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), for allegedly false and misleading statements contained in management's proxy materials. Because we are convinced that Congress did not intend proxy contestants to have a private right of action as such under Section 14(a), and because the complaint before us does not state a cognizable claim for common law fraud, we affirm the district court's dismissal of plaintiffs' suit.

## I. BACKGROUND

The proxy contest at issue involved Realist, Inc., a Delaware corporation having its principal place of business in Wisconsin.[1]

1. For ease in reference, we treat the appeal as if Realist were the sole defendant and appellee, although acknowledging by this reference that eight of Realist's past and present directors were

The plaintiffs, Royal Business Group, Inc. (Royal) and its wholly owned subsidiary, American Business Group, Inc. (ABG), New Hampshire corporations headquartered in Massachusetts, contend that, but for Realist's failure to disclose certain material information in the course of soliciting proxies, they would never have waged the proxy war, thus saving hundreds of thousands of dollars. We limn the relevant circumstances in accordance with the protocol which Fed.R.Civ.P. 12(b)(6) demands. *See, e.g., Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 51 (1st Cir.1990) (on motion to dismiss, reviewing court must accept all well-pleaded facts as they appear in the complaint and indulge all reasonable inferences in the plaintiffs' favor); *Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 16 (1st Cir.1989) (same).

In March 1988, ABG began to acquire Realist stock, ultimately buying 55,010 shares (8% of the issued and outstanding voting stock). In May of that year, Royal sent Realist the first of a series of letters declaring its intention to acquire all Realist's outstanding shares at an above-market premium. Realist repulsed the plaintiffs' serial overtures, reaffirming its intention to remain independent and essaying a variety of defensive actions to thwart a hostile takeover. The directors reduced the size of the board.[2] They also began wooing a Swiss-based company, Ammann Laser Technik AG (Ammann). Although negotiations with Ammann were already well underway by the spring of 1989, Realist's proxy solicitation materials for the annual meeting, mailed on April 27, 1989, made no mention of them.[3]

Meanwhile, rebuffed by management and unaware of Realist's negotiations with Ammann, Royal instituted a proxy contest seeking, indirectly, a shareholder referendum on its offer to acquire Realist. As part of the battle plan, ABG notified the defendant of the plaintiffs' intention to nominate candidates for the two directorships to be filled at the June 6, 1989 annual meeting. The plaintiffs' proxy materials emphasized that their nominees, if elected, would actively pursue the sale of Realist to Royal. Five days before the annual meeting, two Realist directors purchased 26,000 shares of Realist stock. Although the seller had theretofore signed a proxy in favor of the plaintiffs' nominees, that proxy was revoked at the time of the sale and replaced by a proxy favoring the incumbent slate.

To make a tedious tale tolerably terse, the annual meeting took place as scheduled. The insurgents prevailed. The defeated incumbents challenged the election results in the Delaware Chancery Court. On June 30, 1989, Realist announced its acquisition of Ammann. In response to the announcement, Royal immediately withdrew its offer to acquire Realist.[4]

Invoking both federal question and diversity jurisdiction, 28 U.S.C. §§ 1331, 1332, the plaintiffs filed this civil action in the United States District Court for the District of Massachusetts. In their complaint, they alleged that Realist, in the proxy materials sent to shareholders prior to the annual meeting, had failed to disclose im-

also named as defendants and appear as appellees.

2. Because of the directors' staggered terms, the change (from seven directors to six) had the effect of shrinking the number of seats to be filled at the 1989 annual meeting from three to two.

3. The planned acquisition of Ammann was potentially important to the proxy context in a variety of ways. It was to be financed partially by issuing stock, thus diluting the plaintiffs' stake in Realist, and partially by a cash payment, thus depleting Realist's liquid reserves. Consummation of the deal would also make Realist a less attractive takeover candidate since Ammann was likely, in the short run, to be a drag on earnings. Lastly, the planned transaction was designed to resurrect the newly eliminated board seat, *see supra* note 2, confer it on Ammann's president, Hans–Rudolph Ammann, and further strengthen management's hand by giving 68,000 shares of Realist stock to Mr. Ammann.

4. On September 19, 1989, the Delaware court sustained the incumbents' challenge and ordered a new election. *See Parshalle v. Roy,* 567 A.2d 19 (Del.Ch.1989). Royal did not contest either of the seats when the election was replayed on December 15, 1989.

portant matters (e.g., the negotiations to acquire Ammann; the planned acquisition of the 26,000–share block of stock) and that this failure constituted both a violation of Section 14(a) (count 1) and common law fraud (count 2). The complaint sought money damages of $350,000, more or less, representing the expenses incurred in connection with the proxy contest, election, and ensuing Delaware litigation. The gravamen of the suit lay in the idea that, had Realist complied with its disclosure obligations, the plaintiffs would have withdrawn their acquisition offer and eschewed the costly proxy contest.

The defendants moved to dismiss the complaint for failure to state a claim upon which relief could be granted. Fed.R. Civ.P. 12(b)(6). The district court obliged. *Royal Business Group, Inc. v. Realist, Inc.*, 751 F.Supp. 311 (D.Mass.1990) (*RBG I*). This appeal followed.[5]

## II. THE SECURITIES CLAIM

Section 14(a) of the Securities Exchange Act prohibits any person from soliciting proxies "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for protection of investors." 15 U.S.C. § 78n(a). The SEC promulgated Rule 14a–9 thereunder, which provides:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to correct any statement therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a–9 (1990).

■ It is well established that shareholders have a private right of action under Section 14(a) and Rule 14a–9 against issuers of allegedly false or misleading proxy materials. *See J.I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). As the *Borak* Court reasoned: "While [Section 14(a)'s] language makes no specific reference to a private right of action, among its chief purposes is the 'protection of investors,' which certainly implies the availability of judicial relief to achieve that result." *Id.* at 432, 84 S.Ct. at 1559–60.

To say that shareholders have a private right of action under Section 14(a) is not necessarily to say that shareholders may unleash Section 14(a) even without a meaningful link between the claimed proxy violation and the shareholder's role *qua* shareholder. This case, then, tests the margins of the *Borak* doctrine. Plaintiffs claim that their status as shareholders of Realist gives them carte blanche under Section 14(a) to seek damages for the expenses they incurred in a materially different capacity: as proxy contestants.[6] Thus, the

---

**5.** The relationship between the plaintiffs and their claims is somewhat muddled. ABG, not Royal, was the record owner of Realist stock. Royal, on the other hand, was the tender-offeror and proxy contestant; it apparently expended most of the sums sought as damages. The district court ruled that ABG had capacity to sue, but that Royal could not assert a claim based on shareholders' voting rights because it was "not even a shareholder of Realist," *RBG I*, 751 F.Supp. at 313. The plaintiffs argue that Royal, as ABG's parent and the beneficial owner of the shares, may sue as a shareholder under Section 14(a). Rather than gratuitously deciding so gnarled a question, we have elected, for argument's sake, to treat Royal and ABG as if they jointly owned the Realist shares. *See Chongris*

*v. Board of Appeals*, 811 F.2d 36, 39 (1st Cir.) (in civil rights suit where record unclear as to which of two plaintiffs was the proper claimant, the court of appeals, in affirming a Rule 12(b)(6) dismissal based on other grounds, need not decide the standing issue, but could for convenience treat the two plaintiffs "as if they shared in common" any claims that existed), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 765 (1987). Hence, from this point forward, we refer to Royal and ABG, collectively, as "Royal" or "the plaintiffs."

**6.** The plaintiffs, of course, incurred the expenses in question in their twofold capacity as proxy contestants and tender-offerors. This ap-

issue before us is not *whether* there is a private remedy, or even *who* may invoke that remedy, *cf. Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 55 n. 4, 97 S.Ct. 926, 956 n. 4, 51 L.Ed.2d 124 (1977) (Stevens, J. dissenting), but *when* or, put another way, *under what circumstances*, that remedy may be invoked.

## A.

### *Standing*

A formidable obstacle confronts litigants who attempt to assert implied rights of action. *See Arroyo–Torres v. Ponce Federal Bank*, 918 F.2d 276, 278 (1st Cir.1990). That obstacle does not loom only where the issue is whether a private right of action exists *at all;* it is equally forbidding in cases where an implied right of action exists but its scope is uncertain. In either event, unless congressional intent to allow the private right of action "can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist." *Thompson v. Thompson*, 484 U.S. 174, 179, 108 S.Ct. 513, 516, 98 L.Ed.2d 512 (1988) (quoting *Northwest Airlines, Inc. v. Transport Workers Union*, 451 U.S. 77, 94, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981)). Hence, our determination of the remedial reach must focus on Congress' intent in enacting the statute. *See id.; see also Arroyo–Torres*, 918 F.2d at 278; *Kwatcher v. Massachusetts Service Employees Pension Fund*, 879 F.2d 957, 965 (1st Cir.1989).

This said, we turn to *Borak*. There, the Court, having examined the legislative history of Section 14(a), concluded that Congress' primary purpose in enacting the statute was to promote and protect shareholder democracy. *See, e.g., Borak*, 377 U.S. at 431, 84 S.Ct. at 1559 ("The section stemmed from the congressional belief that '[f]air corporate suffrage is an important right that should attach to every equity security bought on a public exchange.'") (quoting H.R.Rep. No. 1383, 73d Cong., 2d Sess. 13 (1934)). As the Court later explained, Section 14(a) "was intended to promote 'the free exercise of the voting rights of stockholders' by ensuring that proxies would be solicited with an 'explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought.'" *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 381, 90 S.Ct. 616, 620, 24 L.Ed.2d 593 (1970) (quoting H.R. Rep. No. 1383, *supra*, and S.Rep. No. 792, 73d Cong., 2d Sess. 12 (1934)). Thus, the existence of a private right of action under Section 14(a) was inferred from the legislative history evidencing congressional concern to vindicate the voting rights of shareholders.

■ In determining whether the reach of the private remedy under Section 14(a) encompasses the claims asserted by Royal, we deem it appropriate to seek guidance in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). The *Cort* approach contemplates that we will ask four questions: Is the plaintiff a member of the class for whose "especial benefit" the statute was passed? Is there any cogent indication of legislative intent to create or deny the remedy sought? Would recognition of the remedy be "consistent with the underlying purposes" of the statutory scheme? Would it be inappropriate to infer a federal remedy because "the cause of action [is] one traditionally relegated to state law ...."? *Id.* at 78, 95 S.Ct. at 2088. These questions, although clearly subordinate to the "central inquiry" into congressional intent, *see Touche Ross & Co. v. Redington*, 442 U.S. 560, 574–76, 99 S.Ct. 2479, 2488–89, 61 L.Ed.2d 82 (1979), remain useful "[a]s guides to discerning that intent," *Thompson*, 484 U.S. at 179, 108 S.Ct. at 516; and in this case, we find them to be especially well adapted to mapping the perimeter of an established private right of action.

Here, the claim of standing produces less than satisfactory answers to at least three of the four *Cort* questions. In the first place, it is crystal clear that, although ap-

peal does not require that we distinguish between those closely related capacities. For sim-

plicity's sake, we use the term "proxy contestant" to describe the whole of the dual roles.

pellants were shareholders of Realist, they did not initiate suit in that capacity. They do not complain that they (or any other Realist stockholders, for that matter) were denied the right to vote their shares knowledgeably. They sue instead in their role as disappointed proxy contestants. As such, they do not come within the class for whose particular benefit Section 14(a) was enacted. In the second place, there is absolutely no hint in the language or structure of the statute, or in the legislative history, that Congress was concerned with the rights of proxy contestants as opposed to the rights of shareholders. *See, e.g., Klaus v. Hi-Shear Corp.,* 528 F.2d 225, 232 (9th Cir.1975) ("In enacting section 14(a), Congress intended to guarantee the integrity of the processes of corporate democracy."). In the third place, the remedy sought—reimbursement of the expenses Royal incurred in the abortive proxy contest—does not dovetail in any discernible way with Section 14(a)'s underlying purpose. We are utterly at a loss to see how, under these circumstances, the voting rights of shareholders would be furthered by implying a private right of action under Section 14(a) in favor of regretful proxy contestants. We think that the Court's elision of *Cort* and *Borak* is peculiarly apt in describing the result we must reach: "[W]hile 'it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose,' in this instance the remedy sought would not aid the primary congressional goal." *Cort,* 422 U.S. at 84, 95 S.Ct. at 2090 (quoting *Borak,* 377 U.S. at 433, 84 S.Ct. at 1560).

Let us be perfectly clear: our holding is not that a shareholder who also happens to be a proxy contestant might never have an actionable claim under Section 14(a). Rather, we hold that where, as here, a plaintiff's specific claim arises from its role as a proxy contestant, not from its role as a shareholder, the relief sought would not serve the statutory purpose of safeguarding the corporate voting process; and therefore, implying a private right of action would in no way promote Congress' intent. Hence, because the plaintiffs' role in the contest and the remedy they seek do not further the objectives which Section 14(a) was designed to achieve, they cannot clear the "high hurdle," *Arroyo-Torres,* 918 F.2d at 278, which must be vaulted.

The appellants have done their best to fashion a silken purse from a sow's ear. They place their utmost reliance on *Haas v. Wieboldt Stores, Inc.,* 725 F.2d 71 (7th Cir.1984). *Haas,* however, is distinguishable. Seeking a seat on the defendant's board, Haas duly delivered his proxy materials to the company for mailing. *Id.* at 72. The same day and without any notice, the company changed the date of the stockholders' meeting and subsequently refused to mail Haas' statement because it contained misinformation, i.e., the wrong meeting date. *Id.* Thus, the violation alleged by Haas, unlike the alleged violation in this case, was one that directly implicated shareholder voting rights. The action complained of clearly could have deprived shareholders of the ability to exercise their electoral franchise had Haas not prepared new proxy materials. Second, the remedy Haas sought—reimbursement for the expenses of preparing the discarded proxy materials—was one that furthered the purpose of Section 14(a) by assuring that a company could not deprive its shareholders of the opportunity to vote knowledgeably by loading heavy costs on insurgents. Third, the *Haas* case involved Rule 14a–7, *see id.,* a rule that imposes a specific duty on corporations to mail insurgents' proxy materials, whereas Rule 14a–9, at issue here, imposes no comparable duty upon a corporation vis-a-vis an unsuccessful proxy contestant.

█ The next weapon in plaintiffs' poorly stocked armamentarium is *Studebaker Corp. v. Gittlin,* 360 F.2d 692 (2d Cir.1966). There, Judge Friendly analyzed Section 14(a)'s legislative history and found that:

Congress anticipated protection from "irresponsible outsiders seeking to wrest control of a corporation away from honest and conscientious corporation officials," S.Rep. No. 1455, 73d Cong., 2d Sess. 77 (1934), and the Proxy Rules are shot through with provisions recognizing

that in contests for control the management has a role to play as such and not merely insofar as the managers are stockholders.

*Id.* at 695. Seizing on this passage, the plaintiffs argue that, since the same legislative history shows that Congress also intended Section 14(a) to protect shareholders from "unscrupulous corporate officials seeking to retain control of the management by concealing and distorting facts," S.Rep. No. 1455, *supra*, a proxy contestant must have a complementary role to play in policing such violations. We find the asseveration to be at best a heuristic, if not a non sequitur. *Studebaker* makes it clear that standing, whether claimed by a target company or a proxy contestant, exists only in those circumstances where the putative plaintiff is acting in a capacity consistent with the purposes of Section 14(a). 360 F.2d at 694–95. As demonstrated above, that proposition does not assist Royal's cause.

To summarize, under *Borak* and *Thompson*, any role to be played by proxy contestants must be limited to circumstances consistent with Section 14(a)'s underlying purpose of "promot[ing] the free exercise of the voting rights of shareholders." *Mills*, 396 U.S. at 381, 90 S.Ct. at 620. Although in some situations standing for proxy contestants might help to promote the efficacy of shareholder democracy, *cf. Ameribanc Investors Group v. Zwart*, 706 F.Supp. 1248, 1253 (E.D.Va.1989) (discussing standing for target companies as a means of guaranteeing shareholder rights), this is hardly one of them. Given plaintiffs' own

statement of their claims, it would be poppycock to infer that this suit was brought in the interest of ensuring other shareholders a fairer, better informed proxy contest. To imply a private right of action in favor of a disappointed proxy contestant seeking to recover damages for an election contest that, in retrospect, it would have preferred not to wage would stretch Section 14(a) beyond any reasonable limit. We find the statute's language not to be so elastic and Congress' intent not to be so unfocused.[7]

■ There is little more that can constructively be said. Shareholders, like other folk, routinely wear a multitude of hats. The fact that a proxy contestant is also a shareholder does not mean that every action it undertakes falls within its capacity as a shareholder. *Cf. Sheinkopf v. Stone*, 927 F.2d 1259, 1265. (1st Cir.1991) ("The fact that a person is a lawyer ... does not mean that every relationship he undertakes is, or reasonably can be perceived as being, in his professional capacity."). Whether or not a proxy contestant who also happens to be a shareholder should be able to sue in the latter capacity depends on an analysis, under the particular circumstances of each case, of the rights being asserted. Here, the plaintiffs' posture is that of proxy contestants—nothing more. The rights being asserted and the damages being sought have nothing to do with the purposes which animate Section 14(a). Mindful of these realities, we do not believe that standing can be conferred, without more, by the mere coincidence that a proxy contestant also enjoys shareholder status.[8]

---

**7.** In a recent case, a panel of the Fifth Circuit appears to have assumed *sub silentio* that a tender-offeror had standing to sue under Section 14(a). *See Justin Indus., Inc. v. Choctaw Secur., L.P.*, 920 F.2d 262, 267 (5th Cir.1990). Although *Justin* is much different on its facts, we see no need to map the distinctions. Suffice to say that the *Justin* court does not indicate that the issue of the tender-offeror's standing to sue under Section 14(a) was ever raised by the litigants, let alone considered by the panel.

**8.** We agree for the most part with the thoughtful analyses employed by the court below and by the district court in *Bolton v. Gramlich*, 540 F.Supp. 822 (S.D.N.Y.1982), a case which, like this one, involved a demand for reimbursement

of proxy expenses by "disappointed tender-offerors who strain to find protection in federal law." *Id.* at 827. We do, however, interject a caveat: to the extent that these cases stand for the proposition that a tender-offeror, per se, as a person "Congress intended to regulate, not to protect," *RBG I*, 751 F.Supp. at 313, *quoting Bolton*, 540 F.Supp. at 833–34, lacks standing to sue under Section 14(a), we believe they go too far. While the legislative history of the Williams Act has been interpreted by the Court to deny a takeover bidder standing to sue for damages under Section 14(e), *see Chris–Craft*, 430 U.S. at 35–37, 97 S.Ct. at 946–47, there is no reason to extrapolate this analysis to Section 14(a), the legislative history of which indicates no particular concern for regulating tender-of-

## B.

### Transactional Nexus

 Apart from standing, the plaintiffs face still another insuperable obstacle in their attempt to construct a claim under Section 14(a): their complaint fails to establish a causal nexus between their alleged injury and some corporate transaction authorized (or defeated) as a result of the allegedly false and misleading proxy statements.

The need to plead and prove a transactional nexus in a proxy solicitation case is not legitimately in doubt. *See, e.g., Gaines v. Haughton,* 645 F.2d 761, 775 (9th Cir. 1981), *cert. denied,* 454 U.S. 1145, 102 S.Ct. 1006, 71 L.Ed.2d 297 (1982); *Schlick v. Penn–Dixie Cement Corp.,* 507 F.2d 374, 381–82 (2d Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *Murray v. Hospital Corp. of America,* 682 F.Supp. 343, 348–49 (M.D.Tenn.1988), *aff'd,* 873 F.2d 972 (6th Cir.1989); *Leff v. CIP Corp.,* 540 F.Supp. 857, 866 (S.D.Ohio 1982); *see also Mills,* 396 U.S. at 385, 90 S.Ct. at 622 ("Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if ... he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.").[9] Indeed, the requirement's pedigree is impeccable; its lineage can be traced to the root purposes of Section 14(a), viz., "prevent[ing] management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation," *Borak,*

377 U.S. at 431, 84 S.Ct. at 1559, and ensuring that proxies will be solicited with an "explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought," *Mills,* 396 U.S. at 381, 90 S.Ct. at 620. Thus, we agree entirely with the Ninth Circuit that "[t]his 'transactional causation' is an essential element of a [§] 14(a) action." *Gaines,* 645 F.2d at 776 (quoting *In re Tenneco Secur. Litigation,* 449 F.Supp. 528, 531 (S.D.Texas 1978)).

In this instance, the proxy solicitation was geared toward only one corporate transaction: the election of directors. The plaintiffs can make no viable claim that they, as shareholders, were harmed by that transaction, since the candidates they nominated achieved at least a paper victory. The only "injury" that plaintiffs suffered was caused by their involvement as combatants in an election they won—but one where, in retrospect, they would rather not have entered the lists. It is simply too much of a stretch to bring such a claim within the causative sphere required for viability under Section 14(a). The plaintiffs did not plead, and are unable on the facts as disclosed to prove, that the expense of their now lamented proxy contest resulted from any transaction that the shareholders authorized (or defeated) in consequence of management's allegedly improper proxy materials. Accordingly, the required element of transactional causation was utterly lacking. *Cf., e.g., Gaines,* 645 F.2d at 779 (allegations that management failed to disclose questionable payments to foreign officials did not state cause of action under Section 14(a)); *Abbey v. Control Data Corp.,* 603 F.2d 724, 732 (8th Cir.1979) (sim-

---

ferors. Furthermore, we note that the *Chris–Craft* Court, in denying standing, emphasized that the damages claimed were related to the plaintiff's "status as a contestant for control of a corporation," not to "its status as a [ ] shareholder," *id.* at 35, 97 S.Ct. at 946, thus leaving open the possibility that, under other circumstances, a tender-offeror might be able to sue in its capacity as a shareholder under Section 14(e). *See id.*

**9.** We note that the Court has lately agreed to review the question left open in *Mills,* 396 U.S. at 385 n. 7, 90 S.Ct. at 622 n. 7, "whether

causation would be shown where management controls a sufficient number of shares to approve the transaction without any vote from the minority." *Sandberg v. Virginia Bankshares, Inc.,* 891 F.2d 1112, 1120–21 (4th Cir.1989), *cert. granted,* ── U.S. ──, 110 S.Ct. 1921, 109 L.Ed.2d 285 (1990). While it is possible that the Court's resolution of *Sandberg* may touch upon the issue here, the markedly dissimilar facts render it unlikely that any holding in that case would cast added light on the situation at bar. We see no reason to stay our hand.

ilar), *cert. denied,* 444 U.S. 1017, 100 S.Ct. 670, 62 L.Ed.2d 647 (1980).

## III. THE FRAUD CLAIM

The plaintiffs assert in count 2 of their complaint that omission of the selfsame information from the proxy solicitation materials (e.g., nondisclosure of the Ammann negotiations and the Realist insiders' purchase of shares) constituted common law fraud. This claim sounds in tort, requiring that we apply state law, guided by the choice-of-law rules of the forum. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). The parties disagree not only as to what state's substantive law (Delaware or Massachusetts) should control, but as to what choice-of-law rules a Massachusetts court would employ in resolving the conflict. The court below sided with the plaintiffs on this issue, finding that, under Massachusetts' hybrid approach to choice-of-law determinations in tort actions, Delaware law should be applied. *See RBG I,* 751 F.Supp. at 314 n. 4. It is unnecessary that we make a formal choice of law since, whether Delaware or Massachusetts law is used, the result will not vary. *See Fashion House, Inc. v. K Mart Corp.,* 892 F.2d 1076, 1092 (1st Cir. 1989) ("When a choice-of-law question has been reduced to the point where nothing turns on more precise refinement, that should be the end of the matter.").

### A.

#### Pleading Fraud

■ Choice of law aside, we start our analysis of count 2 with a hardy jurisprudential strain indigenous to both Massachusetts and Delaware: there can be no actionable claim of fraud for failure to disclose in the absence of a duty to disclose. *See Metropolitan Life Ins. Co. v. Ditmore,* 729 F.2d 1, 5 (1st Cir.1984) (construing Massa-

chusetts law); *Solomon v. Birger,* 19 Mass.App.Ct. 634, 477 N.E.2d 137, 142, *rev. denied,* 395 Mass. 1103, 481 N.E.2d 198 (1985); *Stephenson v. Capano Devel., Inc.,* 462 A.2d 1069, 1074 (Del.1983); *Lock v. Schreppler,* 426 A.2d 856, 862 (Del.Super. 1981). In this case, the plaintiffs can identify no legal basis on which an affirmative duty to disclose might rest.

■ The plaintiffs try to fill the void in several ways. First, they argue that Realist's directors had a fiduciary duty to provide full disclosure of the material facts with respect to all issues requiring shareholder approval. While this tenet is generally true, *see, e.g., In re Anderson, Clayton Shareholders' Litigation,* 519 A.2d 680, 689–90 (Del.Ch.1986) ("one element of the fiduciary duty that directors of a Delaware corporation owe to shareholders is the duty to provide full and honest disclosure of material facts relating to any transaction that requires shareholder approval"); *Smith v. Van Gorkom,* 488 A.2d 858, 890 (Del.1985) (directors have fiduciary duty to shareholders "to disclose all facts germane to the transaction at issue in an atmosphere of complete candor"), it is inapposite here. For one thing, the plaintiffs charge a failure to disclose matters which do not themselves require shareholder approval and which bear no sufficient relationship to matters requiring shareholder approval. *See supra* Part II(B); *see generally* Del.Corp.L.Ann. §§ 251, 271 (1990) (requiring shareholder approval only for extraordinary corporate transactions, such as mergers or substantial asset sales).[10] For another thing, to the extent that nondisclosure may be said to relate to the June 6 election of directors, the claim is governed by Section 14(a), under which, as discussed in Part II(A), *supra,* the plaintiffs lack standing to sue. And last but not least, corporate directors owe fiduciary duties to shareholders, not to prospective bidders trying to decide whether or not to vie for

---

**10.** Not surprisingly, the cases which plaintiffs cite in support of their "fiduciary duty" argument all involved nondisclosure of matters which, unlike those at issue here, required a vote of the shareholders. *See, e.g., Anderson, Clayton,* 519 A.2d 680 (recapitalization); *Van*

*Gorkom,* 488 A.2d 858 (cash-out merger and tender offer); *Lynch v. Vickers Energy Corp.,* 383 A.2d 278 (Del.1977) (same). For that reason, plaintiffs' reliance on the cases is misplaced.

corporate control. Here again, then, plaintiffs' attempt to don their shareholders' hat cannot disguise the bald fact that their underlying claim has nothing to do with their shareholder status.

■ Plaintiffs also suggest that a duty to disclose might arise from the publication of "half-truths" in Realist's proxy materials. Both Massachusetts and Delaware recognize that, even absent an affirmative duty to disclose, a corporation that chooses to make a disclosure shoulders certain responsibilities of completeness and accuracy. *See, e.g., Ditmore,* 729 F.2d at 5 (partial disclosures and half-truths are, under some circumstances, tantamount to misrepresentations of fact); *Kannavos v. Annino,* 356 Mass. 42, 247 N.E.2d 708, 711–12 (1969) (similar); *Lock,* 426 A.2d at 862 ("Although there is no general duty to speak, nevertheless, if a person undertakes to speak, he then has a duty to make a full and fair disclosure as to the matters about which he assumes to speak.").

■ Be that as it may, the factual allegations in the plaintiffs' complaint, however liberally construed, do not identify any extracts from Realist's proxy materials that can be said to be inaccurate or incomplete in any material respect. Whether scanned in reference to each of the specific matters about which the plaintiffs complain, *see* Complaint ¶¶ 28, 33, 52, 54–55 (Ammann acquisition); ¶¶ 41, 51, 56–58 (size of board); ¶¶ 42, 46, 53 (directors' acquisition of additional shares), or in reference to the defendant's proxy materials as a whole, *see* Complaint ¶¶ 59–63, the complaint neglects to specify with reasonable particularity a single partial or inaccurate disclosure.[11] To be sure, the complaint is lengthy—but prolixity is neither a substitute for, nor a guarantor of, specifici-

ty. We fully agree with the court below that the plaintiffs, in their complaint, failed to "point to any specific statements which, in light of th[e] undisclosed information, were false when made." *RBG I,* 751 F.Supp. at 315 n. 5.

In a nutshell, the complaint here, like that found deficient in *Roeder v. Alpha Indus., Inc.,* 814 F.2d 22 (1st Cir.1987), a Rule 10b–5 case, "does not mention any required or voluntary disclosures [the defendant] made that were inaccurate, incomplete, or misleading." *Id.* at 26. Plaintiffs' underlying assumption seems to be that a corporation must disclose all material information, come what may, even in the absence of a regulation requiring disclosure or a misleading prior disclosure. We rejected that assumption in *Roeder. See id.* at 27; *see also Backman v. Polaroid Corp.,* 910 F.2d 10 (1st Cir.1990) (en banc). We again decline to construct, out of thin air, so generalized a duty to disclose.

■ Nor can plaintiffs skirt their failure to earmark half-truths by hiding behind the procedural swaddling of Rule 12(b)(6). Although the pleading threshold is low, "it is real—and it is the plaintiff's burden to take the step which brings his case safely into the next phase of the litigation." *Gooley v. Mobil Oil Corp.,* 851 F.2d 513, 514 (1st Cir.1988). Moreover, in fraud cases, the threshold is elevated somewhat. Under the Civil Rules, parties must plead fraud with particularity. *See* Fed.R.Civ.P. 9(b); *see also Powers v. Boston Cooper Corp.,* 926 F.2d 109, 111 (1st Cir.1991); *McGinty v. Beranger Volkswagen, Inc.,* 633 F.2d 226, 228–29 (1st Cir.1980). The requirement that fraud be pleaded with specificity is especially valued in the securities law context. *See Romani v. Shearson Leh-*

---

**11.** We do note the allegation of a failure to update the proxy materials with regard to the 26,000–share purchase. Complaint ¶ 47. Any such duty to update, however, would have to arise from Section 14(a) and Rule 14a–9, under which plaintiffs lack standing to sue. *See supra* Part II(A). Furthermore, plaintiffs admitted that the earlier information disclosed regarding directors' share ownership was accurate, *see* Complaint ¶ 47; and we are cognizant that the information was consistent with the require-

ments of Schedule 14A (information required in proxy statement), 17 C.F.R. § 240.14a–101 (Item 6). Ergo, we are constrained to read plaintiffs' allegation that defendant's proxy statement, mailed on April 27, 1989, "contained no information regarding the newly acquired voting rights," Complaint ¶ 53, as stating a factual impossibility, since the 26,000 shares were not acquired until June 1, 1989. *See* Complaint ¶ 43.

*man Hutton,* 929 F.2d 875, 878 (1st Cir. 1991) (courts "have been especially vigorous in demanding such factual support in the securities context to minimize" strike suits); *Wayne Invest., Inc. v. Gulf Oil Corp.,* 739 F.2d 11, 13 (1st Cir.1984) (similar).

The present plaintiffs have not made so much as a feeble gesture at putting any flesh on the bare bones of their fraud averments. Those averments comprise solely conclusory allegations and accusatory epithets. Because we "need not credit bald assertions, periphrastic circumlocutions, unsubstantiated conclusions, or outright vituperation" in considering a complaint's sufficiency under Rule 12(b)(6), *Correa–Martinez,* 903 F.2d at 52, we have no hesitancy in affirming the district court's dismissal of count 2.

### B.

### *Leave To Amend*

The plaintiffs claim for the first time, in a footnote to their brief on appeal, that, if the lower court found the complaint's allegations too exiguous, it should have granted leave to amend. By its terms, the argument is limited to count 2. However narrowly circumscribed, it comes too late.

The plaintiffs had the option of filing an amended complaint at any time during the eleven-month period that the motion to dismiss was pending, *see id.,* at 59 n. 8; *Dartmouth Review,* 889 F.2d at 22; *see also* Fed.R.Civ.P. 15(a), but chose not to exercise that option. Even after the motion was granted, the plaintiffs did not ask the district court for leave to amend, preferring instead to test the appellate waters.

It is the practice in this circuit that, when a plaintiff, rather than amending, chooses to appeal from a judgment of dismissal, the court of appeals, if the order of dismissal is affirmed, will not permit an amended complaint to be filed. *See Powers,* 926 F.2d at 112; *Rivera–Gomez v. de Castro,* 843 F.2d 631, 635–36 (1st Cir.1988). This case falls comfortably within the general rule, not within what we have termed the "long-odds

exception" to it. *Dartmouth Review,* 889 F.2d at 22 & n. 9. We decline, therefore, to grant the plaintiffs' afterthought request for leave to amend count 2 of their complaint. *See Powers,* 926 F.2d at 112; *Beaulieu v. United States Internal Revenue Serv.,* 865 F.2d 1351, 1352 (1st Cir.1989).

*Affirmed. Costs in favor of appellees.*